**IN THE UNITED STATES DISTRICT
COURT FOR THE DISTRICT OF
MARYLAND**

| | |
|---|---|
| **DONNA DENISON,** | |
| *Petitioner*, | |
| v. | **Case No. 1:24-cv-01484-JRR[1]** |
| **HORSEY DENISON LANDSCAPING, LLC,** *et al.*, | |
| *Respondents*. | |

**MEMORANDUM OPINION**

Pending before the court is Petitioner Donna Denison's Petition for Confirmation of "Arbitration" Award. (Case No. 1:25-cv-00448-JRR, ECF No. 1; the "Petition.") The court has reviewed all papers; no hearing is necessary. Local Rule 105.6 (D. Md. 2025). For the reasons set forth below, by accompanying order, the Petition will be granted.

## I.   BACKGROUND[2]

### A.  Factual Background

On October 22, 2021, Petitioner Donna Denison and Respondent Horsey Denison Landscaping, LLC ("HDL") entered into a Stock and Membership Purchase Agreement (the "APA") pursuant to which HDL purchased the equity interests in Denison Landscaping, Inc., Denison Landscaping & Nursery, Inc., and Denison Farms, LLC (collectively, the "Companies") from Ms. Denison. (Case No. 1:25-cv-00448-JRR, ECF No. 1 ¶ 11; *see* APA, Ex. 2., Case No. 1:25-cv-00448-JRR, ECF No. 1-3.)[3] On the same date, Ms. Denison and HDL

---

[1] To conserve space, the court has abbreviated the case caption to reflect the parties' designations in the instant matter.

[2] For purposes of this Memorandum Opinion, the background consists of the facts and procedural history pertinent to the instant Petition. Unless otherwise noted, the following facts are undisputed.

[3] On May 2, 2025, the court consolidated Case No. 1:25-cv-00448-JRR with Case No. 1:24-cv-01484-JRR, with the latter designated as the lead case in which all future filings were to be made. (ECF No. 73.) References including Case No. 1:25-cv-00448-JRR refer to filings made in the original member case and references without

executed a Note (the "Seller Note"),[4, 5] providing that HDL would pay Ms. Denison a principal sum of $6,000,000, together with interest subject to adjustment under the terms of the APA, as set forth below.  *Id.* ¶ 12; *see* Seller Note, Ex. 3, Case No. 1:25-cv-00448-JRR, ECF No. 1-4. Also on October 22, 2021, Ms. Denison and Respondents Robert E. Horsey and David W. Horsey executed a Guaranty Agreement under which Messrs. Horsey guaranteed HDL's payment obligations under the APA and the Seller Note.  *Id.* ¶ 13; *see* Guaranty Agreement, Ex. 4, Case No. 1:25-cv-00448-JRR, ECF No. 1-5.

Pursuant to the APA, the Purchase Price and corresponding Seller Note were subject to adjustment based on the Companies' working capital.  (Case No. 1:25-cv-00448-JRR, ECF No. 1 ¶ 14.)  The APA required Ms. Denison to deliver a Closing Statement setting forth a good-faith estimate of the Companies' Net Working Capital[6] as of the Closing Date.  *Id.* ¶ 15.  The agreement further provided that, during a 12-month "Collection Expiration Period," HDL would attempt to collect specified accounts receivable and pay specified accounts payable, and the Purchase Price would be reduced if certain accounts payable exceeded the sum of the cash on hand and collected closing date accounts receivables, known as the "Working Capital Adjustment Amount."  *Id.* ¶ 16.  Section 2.06 of the APA, pertaining to purchase price adjustments, specifically provides:

---

a case number refer to filings in the consolidated lead case.  The court's page references are to CM/ECF pagination.

[4] The APA defines "Seller Note" as "that certain Promissory Note attached hereto as Exhibit C, and incorporated as if set forth fully herein, in the original principal amount of the Seller Note Amount dated as of even date herewith by the Buyer, as maker, payable to the Seller. Seller Note shall be secured by a personal guaranty from Robert E. Horsey and David W. Horsey and by a second-position lien on all assets of the Companies, which lien shall be subordinate to Buyer's Fourteen Million Dollar ($14,000,000.00) financing lien with FNB Corporation." APA § 1.01 at p. 14.

[5] Unless otherwise defined herein, capitalized terms shall have the meanings assigned to them in the APA.  *See* APA § 1.01.

[6] "Net Working Capital" is defined "as of the Calculation Time, the difference (whether positive or negative) of (a) Cash on Hand plus Accounts Receivable, minus (b) Accounts Payable; *provided that,* the individual components of 'Net Working Capital' shall be calculated in accordance with the Accounting Principles."  APA § 1.01 at p. 12 (emphasis in original).

(b)     **Working Capital Adjustment.**

(i)     Collection of Accounts Receivables. After the Closing Date and continuing for a period of twelve (12) months thereafter ("Collection Expiration Period"), Buyer shall in good faith and in accordance with commercially reasonable business practices, attempt to collect the accounts receivable existing on the Closing Date ("Closing Date Accounts Receivables"). In determining the collectability of Closing Date Accounts Receivable, the Parties agree that all amounts collected after the Closing shall be applied to the oldest accounts first, unless an account debtor specifies that any one or more of the payments made by such account debtor is being made with respect to a particular outstanding receivable of such account debtor, in which case such payment shall be applied as such account debtor so specifies. An account debtor's dispute of a particular outstanding receivable shall be deemed direction to not pay that particular outstanding receivable until such dispute is resolved. For the avoidance of doubt, the good faith standard imposed on Buyer pursuant to this Section 2.06(b)(i) shall prohibit Buyer and Buyer's Affiliates from instructing any account debtor to specify payments be made with respect to a particular outstanding receivable of such account debtor. All collections shall be paid into and all payables shall be paid from a separate account maintained by the Buyer.

(ii)    Excess Payments. Upon the later to occur of (i) one hundred and twenty (120) days after the Closing Date or (i) the date that collections of the Closing Date Accounts Receivables exceeds the difference of the Closing Date Accounts Payables (defined below) over the Cash on Hand (if any), and on a monthly basis thereafter until the Collection Expiration Period, Buyer shall pay over to Seller the amount of any such excess of the Closing Date Accounts Receivables collected by the Buyer over the difference of the Closing Date Accounts Payables less the Cash on Hand (the "Excess Sums"), together with all corresponding notes, documentation and information received in connection therewith. All Closing Date Accounts Receivable remaining uncollected as of the Collection Expiration Period shall become owed to the Buyer.

(iii)   Payment of Accounts Payable. After the Closing Date and continuing for a period of twelve (12) months thereafter, Buyer shall in good faith and in accordance

> with commercially reasonable business practices, make payment on all accounts payable existing on the Closing Date ("Closing Date Accounts Payables") using the Cash on Hand and, in the event the Cash on Hand is insufficient to payoff all such Closing Date Accounts Payable, collections of the Closing Date Accounts Receivables. To the extent the Accounts Payables exceed the sum of the Cash on Hand and the Closing Date Accounts Receivables collected prior to the Collections Expiration Period ("Working Capital Adjustment Event"), the Purchase Price shall be reduced by an amount determined by the following calculation (the "Working Capital Adjustment Amount"):

> Closing Date Accounts Payable — collections of the Closing Date Accounts Receivable — Cash on Hand

> In the event of a Working Capital Adjustment Event, the principal balance of the Seller Note Amount shall be reduced by the Working Capital Adjustment Amount.

APA §§ 2.06(b)(i)-(iii).

During the Collection Expiration Period, §§ 2.06(b)(v)-(vii) of the APA also required HDL to provide "Post-Closing Statements" as to the status of collections related to accounts receivable and payments of accounts payable and provided guidelines for Ms. Denison to dispute the Post-Closing Statements if necessary.  (Case No. 1:25-cv-00448-JRR, ECF No. 1 ¶¶ 17–18.)  In the event disputes remained unresolved, the APA required the parties to submit the disputed matters to an independent Accounting Firm[7] for resolution pursuant to the procedures set forth in § 2.06 of the APA.  *Id.* ¶ 19.  Section 2.06 provides in relevant part:

> (vii) If Seller timely objects to the contents of the Post-Closing statement within the aforementioned thirty (30) Business Day period by delivering written notice to Buyer (a "Post-Closing Statement Dispute Notice") of any dispute Seller has with respect to the contents of such Post-Closing Statement, then (A) the contents of the Post-Closing Statement to which Seller has not timely objected shall be final, binding and conclusive on the

---

[7] The APA defines Accounting Firm as "an independent accounting firm of nationally recognized reputation and with a national presence, as mutually agreed to by Buyer and Seller. If the parties cannot agree within five (5) business days of the nomination by one party of the Accounting Firm, then each party shall choose a qualified accountant within ten (10) business days of such failure to agree, and the parties' chosen accountants shall together agree upon the Accounting Firm within fifteen (15) days of such failure to agree."  APA § 1.01 at pp. 6–7.

Parties and (B) Seller and Buyer shall in good faith attempt to resolve their disagreement on the disputed items for a period of thirty (30) days following the delivery of the Post-Closing Statement Dispute notice (the "Dispute Period") provided that, in order to be effective, any Post-Closing Statement Dispute Notice must describe in reasonable detail the items contained in the Post-Closing Statement that Seller disputes, and the basis for any such disputes, and include relevant documentation supporting the reason for such dispute. With respect to any items not disputed in the Post-Closing Statement Dispute Notice and deemed to have been accepted by Seller, payment shall be made to Seller in accordance with the terms of this Section 2.06. Furthermore, if in the course of the negotiations during the Dispute Period, Seller and Buyer agree on any components of the Post-Closing Statement, then payment with respect to such components shall be made to Seller pursuant to the terms of Section 2.06.  Should negotiations not result in an agreement on any components of the Post-Closing Statement prior to the expiration of the Dispute Period, then any remaining disputed matters shall, within ten (10) days thereafter, be submitted to the Accounting Firm to be resolved in accordance with the terms and standards set forth in this Section 2.06 and in connection with such engagement, Buyer and Seller shall execute any engagement, indemnity and other agreements that the Accounting Firm reasonably may require as a condition to such engagement. All such negotiations shall be governed by Rule 408 of the Federal Rules of Evidence and any applicable similar Law. The scope of the disputes to be resolved by the Accounting Firm shall be limited to any unresolved items in the Post-Closing Statement Dispute Notice. A Party's refusal to engage the Accounting Firm shall not prohibit the other Party from Engaging the Accounting Firm in accordance with this Agreement and, upon such engagement, the refusing party shall be deemed to have agreed to such engagement.

(viii) There will be no *ex parte* communications between any Party or its Representatives, on the one hand, and the Accounting Firm, on the other hand, other than written answers by Seller or Buyer to written questions of the Accounting Firm (copies of which shall be provided substantially simultaneously to the other Party). In resolving any disputed item, the Accounting Firm may not assign a value to any item greater than the greatest value claimed for such item by either Party or less than the smallest value claimed for such item by either Party. Seller and Buyer shall instruct the Accounting Firm to resolve the disputed items in accordance with this Agreement, including this Section 2.06 and to deliver to Seller and Buyer a written determination . . . of the disputed items within thirty (30) days of the engagement of the Accounting Firm. Absent fraud, willful misconduct or manifest error, such determination will be final, binding and

> conclusive on the Parties.  The Accounting Firm shall act as an expert.  All fees and expenses relating to appointment of the Accounting Firm and the work, if any, to be performed by the Accounting Firm shall be allocated to and borne by Buyer, on one hand, and Seller, on the other hand, based upon the percentage that the portion of the amount contested by and not awarded to a Party bears to total amount in dispute, as determined by the Accounting Firm. . . .
>
> (ix) Following the final determination as to the accuracy of any Post-Closing Statement any remaining payment shall be made to Seller in accordance with the terms of this Section 2.06.

APA §§ 2.06(b)(vii)-(ix).

Consistent with the APA, Ms. Denison asserts that she delivered the required Closing Statement on the Closing Date, which reflected a good-faith estimate of the Companies' then-existing Net Working Capital.  (Case No. 1:25-cv-00448-JRR, ECF No. 1 ¶ 20.)  Thereafter, during the Collection Expiration Period, HDL provided Post-Closing Statements to Ms. Denison.  *Id.* ¶ 21.  Ms. Denison alleges she "timely and properly objected to the vast majority of the items set forth in HDL's Post-Closing Statements."  *Id.* ¶ 22.   Respondents deny this allegation and contend Ms. Denison failed to timely respond and object to HDL's Post-Closing Statements in accordance with the APA and therefore conceded and waived issues raised in the Post-Closing Statement Dispute Notices she did submit.  (Case No. 1:25-cv-00448-JRR, ECF No. 13-1 ¶ 22; ECF No. 121 at pp. 7-9.)

The parties were unable to resolve their disputes concerning HDL's Post-Closing Statements and Ms. Denison's Post-Closing Statement Dispute Notices.  In July 2024, the parties agreed to engage Vallit Advisors, LLC ("Vallit"), as the independent Accounting Firm to resolve the remaining Working Capital Adjustment disputes pursuant to § 2.06 of the APA.  (Case No. 1:25-cv-00448-JRR, ECF No. 1 ¶ 24; Case No. 1:25-cv-00448-JRR, ECF No. 13-1 ¶ 24; ECF No. 121 at p. 12; ECF 192-1 at p. 4.)  Vallit's engagement letter (the "Engagement

Letter"), which the parties agree was fully executed,[8] provides that "[t]he scope of the Dispute to be resolved by Vallit shall be limited to any unresolved items in the Post-Closing Statement Dispute Notice.  Our work will be governed by the terms outlined in Section 2.06 of the [APA]."  (Ex. 5, Case No. 1:25-cv-00448-JRR, ECF No. 1-6 at p. 2.)

On January 30, 2025, after examining the materials submitted by the parties per the engagement, Vallit issued a written report concluding that the Working Capital Adjustment "including the cash shortfall was $2,398,854.13" and "the $2,398,854.13 [was] due to the Seller[,]" Ms. Denison.  (Case No. 1:25-cv-00448-JRR, ECF No. 1 ¶¶ 25-26; Ex. 1, Case No. 1:25-cv-00448-JRR, ECF No. 1-2.)[9]

**B.  Procedural History**

On May 21, 2024, HDL initiated the underlying action against Ms. Denison by filing a Complaint.  (ECF No. 1.)  The Complaint asserts claims for breach of contract (Count I) and

---

[8] Ms. Denison and HDL each provide a copy of the Engagement Letter as executed by the respective parties and their counsel on different dates in July and August 2024.  *See* Ex. 5, Case No. 1:25-cv-00448-JRR, ECF No. 1-6; Ex. 1, ECF No. 192-2.  The court discerns no material difference in the Engagement Letters other than the parties' signatures and execution dates.

[9] On January 31, 2025, counsel for Ms. Denison (copying Respondents' counsel) emailed Vallit:

> We just have two (2) clarifying questions regarding your conclusions:
>
> 1. Based upon HDL's counsel's 11.13.24 (3:35 p.m.) e-mail acknowledging that the repayment of Cash on Hand is a "separate issue" (excerpt pasted and emphasized below) and the content of your conclusions, it appears that Vallit agrees with Ms. Denison that the Cash on Hand of $600,000.00 is still due and owing to Ms. Denison in addition to the $2,398,854.13 already ruled to be due to Ms. Denison. Please clarify Vallit's position in this regard[.]
>
> 2. As we previously highlighted, Ms. Denison reduced her Closing date purchase payment from HDL by $274,119.00 in order to adjust the "Cash on Hand" to $600,000.00. It does not appear that this positive adjustment that Ms. Denison irrefutably paid by and through a purchase price reduction/credit was included in Vallit's Cash Shortfall figure of <$732,425.00>. Please clarify whether it is Vallit's finding that this Closing adjustment was paid and dictates that an additional $274,119.00 is owed to Ms. Denison by reducing the Cash Shortfall figure to (ie., <732,424.59> + $274,119.00).

In response, Vallit confirmed its report: "Yes, the working capital adjustment per our report indicates that Buyer owes Seller $2,398,854.13. Based on our further review of the agreement, the cash on hand is a separate issue and not included in our working capital adjustment, but it does appear that the cash on hand of $600,000 is still due from Buyer to Seller. As to your second point, no additional adjust to cash is needed as the $600,000 already encompasses the repayment of the $274,199."  (Case No. 1:25-cv-00448-JRR, ECF No. 1-8.)

declaratory judgment (Count II) against Ms. Denison for damages incurred for allegedly false representations and warranties made by Ms. Denison to induce HDL into purchasing the Companies and Ms. Denison's attempted acceleration of the Seller Note in breach of the APA and the Seller Note. *Id.* at ¶ 78-94. On July 25, 2024, Ms. Denison filed an Answer (ECF No. 6) and a Third-Party Complaint (ECF No. 8) against Robert and David Horsey asserting a claim for breach of contract.

On August 12, 2024, Ms. Denison and HDL submitted a Joint Motion for Partial Stay. (ECF No. 12; the "Stay Motion".)[10] The Motion stated: "The parties have since agreed to submit all disputes concerning the Working Capital Adjustments to Vallit Advisors, LLC (the "Accounting Firm") for binding resolution of the same, in accordance with the terms of the [APA]." (ECF No. 12 ¶ 6.) The court granted the Stay Motion on August 26, 2024, as follows:

> [A]ll claims made by the parties related to the Working Capital Adjustment claims, as described for reference only in Paragraph 51 of the Complaint and which are unrelated to the indemnification claims asserted by Plaintiff, are stayed pending resolution of the same by the Accounting Firm; provided that such stay is without prejudice to any of the parties raising such dispute at a later time in accordance with the purchase agreement or as may otherwise be permitted by law; and further provided that the aforementioned stay does not in any way operate to stay the separate and distinct indemnification claims raised in this action[.]

(ECF No. 16.) As set forth above, the parties subsequently engaged Vallit and the Vallit report was issued on January 30, 2025.

On February 11, 2025, Ms. Denison filed the instant Petition against Respondents as a separate action, seeking confirmation of the Vallit report as a final and binding arbitration award. (Case No. 1:25-cv-00448-JRR, ECF No. 1.) Respondents had until March 24, 2025, to respond to the Petition. *Id.* at ECF No. 7. On March 25, 2025, after Respondents failed to

---

[10] The Stay Motion provided that Messrs. Horsey consented to the relief requested and had not joined in the motion due to the fact that they had not yet responded to Ms. Denison's Third-Party Complaint. (ECF No. 12 at p. 1 n.1.)

timely respond to the Petition, Ms. Denison moved for a Clerk's Entry of Default, which was entered by the Clerk as to all Respondents on the same day. *Id.* at ECF Nos. 10-12.  On April 8, 2025, Respondents filed a Motion to Vacate Order of Default (the "Motion to Vacate"), which the court subsequently granted for good cause on May 2, 2025. *Id.* at ECF No. 14.[11] Respondents' Motion to Vacate also attached Respondents' joint Answer to the Petition. *Id.* at ECF No. 13-1.[12]  As explained above, Case No. 1:25-cv-00448-JRR was subsequently consolidated with the instant action, and all future filings with respect to the Petition were made herein.  (ECF No. 73.)

After filing the instant Petition, on February 21, 2025, Ms. Denison filed a Motion for Partial Summary Judgment Regarding Alleged Working Capital Adjustment Offset.  (ECF No. 41; the "Motion for Summary Judgment.")  Therein, Ms. Denison argues she is entitled to Summary Judgment on HDL's claims with respect to its alleged Seller Note offset and her Third-Party breach of contract claim against Messrs. Horsey related to the Working Capital Adjustment dispute.  (ECF No. 41-1 at pp. 9–11.)  The Motion for Summary Judgment has been fully brief by the parties and is currently pending.  (ECF Nos. 41, 45, 58.)

On April 15, 2025, on an emergency motion filed by Ms. Denison, the court entered a Temporary Restraining Order ("TRO") enjoining HDL, and its related entities, officers, agents, representatives, employees, and all other persons acting for, on behalf of, or in concert with HDL from, *inter alia,* selling, leasing, transferring, exchanging or otherwise disposing of certain collateral without Ms. Denison's prior written consent. (ECF No. 64.)  On May 6, 2025, prior to resolution of Ms. Denison's Motion for Preliminary Injunction (ECF No. 72) and only four days after the court granted the Motion to Vacate the clerk's entry of default for

---

[11] At the time, Respondents were jointly represented by counsel from McAllister, DeTar, Showalter & Walker. Since then, HDL and Messrs. Horsey are represented by separate counsel, as explained *infra.*

[12] Respondents' joint Answer to the Petition was not separately docketed after entry of the court's order vacating the clerk's default; however, the court refers to the attachment as Respondents' initial answer as of the date the Motion to Vacate was docketed.

Respondents' failure to timely Answer the instant Petition, HDL filed a Notice of Bankruptcy Stay.  (ECF No. 76.)[13]  Subsequently, on May 19, 2025, the court stayed this action in its entirety pursuant to the automatic stay of § 362 of the Bankruptcy Code. (ECF No. 84.)

On November 3, 2025, the court granted Ms. Denison's Motion to Lift Stay as to Third-Party Defendants Robert and David Horsey (the "Lift Stay Motion"), allowing the action to proceed as against Messrs. Horsey only.  (ECF No. 95.)  Given that the stay against Respondent HDL remained in place, to allow the efficient administration of this action, the court ordered Messrs. Horsey to file a separate response to the Petition and Ms. Denison to file a reply (if any) and vacated the TRO that had been stayed as a result of the bankruptcy proceedings.  (ECF No. 102.)  While the Lift Stay Motion was pending, counsel for Messrs. Horsey moved to withdraw as counsel, which motion the court granted.  (ECF No. 103.)  Messrs. Horsey subsequently obtained new counsel and filed a response in opposition to the Petition (ECF No. 121); Ms. Denison timely replied.  (ECF No. 122.)

While litigation in this case continued as to Ms. Denison and Messrs. Horsey only, on December 22, 2025, Ms. Denison filed a Motion for Relief from Automatic Stay in the related bankruptcy court proceeding to permit continuation of the instant litigation against HDL.  (Case No. 25-14103-LSS (Bankr. D. Md.), ECF No. 281.)  Shortly thereafter, on January 9, 2026, HDL and the Companies, as Debtors in the related bankruptcy action, filed an adversary proceeding against Ms. Denison and Messrs. Horsey, asserting multiple claims under the Bankruptcy Code.  (Case No. 26-00008-LSS (Bankr. D. Md.), ECF No. 1.)  Only days later, on January 12, 2026, Messrs. Horsey filed a Motion to Enforce Referral of the instant action to the Bankruptcy Court, seeking to transfer the entire action to the Bankruptcy Court, or,

---

[13] HDL and the Companies sold by Ms. Denison to HDL (collectively, the "Debtors") all separately filed for bankruptcy relief under Chapter 11 of the Bankruptcy Code.  The Bankruptcy Court subsequently entered an order directing the joint administration of the Debtors' cases under one action.  *See* Case No. 25-14103-LSS (Bankr. D. Md.), ECF No. 36.  The consolidated Debtors are separately represented by counsel from YVS Law, LLC, Paul Sweeney.

10

alternatively, to stay the entire action pending resolution of the related HDL bankruptcy proceeding. (ECF No. 125.)  In response to the Debtor's adversary action, Ms. Denison filed a Motion to Withdraw the Reference of the Adversary Proceeding (the "Motion to Withdraw Reference") by this court and an opposition to Messrs. Horsey Motion to Enforce Referral. (Case No. 8:26-cv-00650-JRR, ECF No. 1; ECF No. 128.)[14]

Prior to the court's ruling on the Motion to Enforce Referral and Motion to Withdraw Reference, the Bankruptcy Court issued an order granting Ms. Denison's Motion for Relief from the Automatic Stay to permit the instant action to proceed as to HDL.  (Case No. 25-14103-LSS (Bankr. D. Md.), ECF No. 334.)  Accordingly, this court entered an order lifting the stay in this case as to proceedings maintained by or against HDL.  (ECF No. 156.) Thereafter, at a hearing held in this court on the Motion to Enforce Referral and Motion to Withdraw Reference, Messrs. Horsey voluntarily withdrew their Motion to Enforce Referral and the parties' consented to the court granting Ms. Denison's Motion to Withdraw Reference of the related adversary proceeding, thereby consolidating the related claims into this action and adding the joint Debtors (the Companies) as consolidated Plaintiffs in this action.  (ECF Nos. 158, 162.)[15]

Again, to allow the efficient administration of this action, the court entered an amended scheduling order and noted that the court would not consider additional briefing as to any pending motions by any party, including the instant Petition.  (ECF No. 166.)  In response, HDL filed a Motion for Modification and Reconsideration (the "Motion for Reconsideration") of the court's amended scheduling order, arguing, *inter alia*, that HDL should be permitted to submit its own arguments as to the merits of the Petition, as the court allowed Messrs. Horsey

---

[14] The Motion to Withdraw Reference was opened as a separate action, Case No. 8:26-cv-00650-JRR, which has since been consolidated with the instant action and administratively closed.  (ECF No. 162.)

[15] Mr. Sweeney, as bankruptcy counsel for HDL and the joint Debtors (the Companies), represented HDL and the Companies in these later proceedings.  Mr. Sweeney has since entered his appearance as counsel for HDL and the Companies in this action (ECF No. 160) and previous joint counsel for Respondents also moved to withdraw from their representation of HDL, which motion the court granted.  (ECF No. 182.)

to do when the automatic stay against them was lifted.  (ECF No. 169.)  Upon consideration of the Motion for Reconsideration, the court granted in part and denied in part the motion, allowing, among other things, HDL to submit a response in opposition to the Petition and Ms. Denison to file a reply thereto.  (ECF No. 188.)  Accordingly, HDL filed its own opposition to the Petition (ECF No. 192), in response to which Ms. Denison filed a reply.  (ECF No. 196.)  As such, this matter is, at long last, fully briefed and ripe for ruling.

## II.    APPLICABLE LAW[16]

Arbitration agreements are to be interpreted and enforced as would be any other contract.  Federal Arbitration Act ("FAA"), 9 U.S.C. § 2 (arbitration agreements in contracts "evidencing a transaction involving [interstate] commerce . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract"); *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 443 (2006) (providing that that § 2 of the FAA "embodies the national policy favoring arbitration and places arbitration agreements on equal footing with all other contracts").

As the Supreme Court recently explained:

> The FAA was enacted in response to judicial hostility to arbitration.  Section 2 of the statute makes arbitration agreements "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  As we have interpreted it, this provision contains two clauses: An enforcement mandate, which renders agreements to arbitrate enforceable as a matter of federal law, and a saving clause, which permits invalidation of arbitration clauses on grounds applicable to "any contract."

*Viking River Cruises, Inc. v. Moriana*, 596 U.S. 639, 649–50, *reh'g denied,* 143 S. Ct. 60 (2022)

(footnote omitted).

---

[16] Although the parties invoke review of the Vallit report pursuant to the Maryland Uniform Arbitration Act (the "MUAA"), as set forth *infra*, the court finds that the Federal Arbitration Act governs the parties' dispute and sets forth the applicable standard.

Judicial "[r]eview of an arbitrator's award is severely circumscribed." *Apex Plumbing Supply, Inc. v. U.S. Supply Co., Inc.,* 142 F.3d 188, 193 (4th Cir.1998). "In fact[,] a district court's authority to review an arbitration decision 'is among the narrowest known at law because to allow full scrutiny of such awards would frustrate the purpose of having arbitration at all.'" *AO Techsnabexport v. Globe Nuclear Services and Supply, Ltd.,* 656 F. Supp. 2d 550, 554 (D. Md. 2009) (quoting *Three S. Delaware, Inc. v. DataQuick Information Systems, Inc.,* 492 F.3d 520, 527 (4th Cir. 2007)). "A court must determine only whether the arbitrator did his job—not whether he did it well, correctly, or reasonably, but simply whether he did it." *PPG Indus. Inc. v. Int'l Chem. Workers Union Council,* 587 F.3d 648, 652 (4th Cir. 2009) (internal quotation marks omitted). The burden of proof is on the party challenging the award to clearly establish one of the grounds for vacating the award. *Jih v. Long & Foster Real Estate, Inc.*, 800 F. Supp. 312, 317 (D. Md. 1992).

## III.    ANALYSIS

### A. Whether the Dispute Resolution Process in § 2.06 of the APA Constitutes an Agreement to Arbitrate

In their opposition, Messrs. Horsey first argue the Petition should be denied because "no arbitration, as that term is understood in the MUAA[,] has been conducted and thus the Report is not an award confirmable as a judgment." (ECF No. 121 at p. 19.) In support of their argument, Messrs. Horseys assert that, pursuant to the MUAA, an arbitration requires an evidentiary hearing.[17] *Id.* HDL similarly argues that in submitting the Working Capital Adjustment disputes to Vallit, the parties did not agree to arbitration within the scope of the MUAA. (ECF no. 192-1 at pp. 4–19.) In particular, HDL contends the dispute resolution process contemplated by § 2.06 of the APA is more appropriately referred to as an "expert determination" or "accountant true-up" than an arbitration. *Id.* at p. 9.

---

[17] The MUAA provides that "[u]nless the agreement provides otherwise, the arbitrators shall designate a time and place for hearing[.]" MD. CODE ANN., CTS. & JUD. PROC. § 3-213(a)(1).

In response, Ms. Denison argues that an agreement need not contain the words "arbitrate" or "arbitration" to create an arbitration agreement and "numerous courts have ruled that dispute resolution provisions substantially similar to Section 2.06 of the APA at issue are essentially arbitration clauses and should be treated as such." (ECF 122 at pp. 10–11.)  As an initial matter, as referenced above at footnote 16, although the parties assert that the MUAA controls the issue, the court must independently assess whether that is indeed the case before proceeding further.

### 1. *Controlling Body of Law*

In the Petition, Ms. Denison alleges that "[t]he parties expressly agreed that the resolution of this Petition is to be governed by the laws of the State of Maryland." (Case No. 1:25-cv-00448-JRR, ECF No. 1 ¶ 8.)  Respondents admit this allegation in their initial Answer to the Petition.  (Case No. 25-cv-448, ECF No. 13-1 ¶ 8.)

Regarding applicable law, the APA provides:

> (c)    This Agreement and all questions concerning the construction, validity and interpretation hereof shall be governed by and construed in accordance with the laws of the State of Maryland, without giving effect to any choice or conflict of law provision or rule (whether of the State of Maryland or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Maryland.
>
> (d)    Each of the Parties irrevocably agrees that any Proceeding (whether in contract, tort or otherwise) arising out of, with respect to or relating to this Agreement, including any matters concerning the scope and applicability of this Section 8.10, shall be exclusively brought in federal courts located in Maryland.

(APA § 8.10(b)–(c), Case No. 1:25-cv-00448-JRR, Ex. 2, ECF No. 1-3.)  In light of this provision, Ms. Denison alleges "where applicable, the parties' disputes under the Purchase Agreement are subject to the [MUAA.]"  (Case No. 1:25-cv-00448-JRR, ECF No. 1 ¶ 9.)  Respondents deny this allegation.  (Case No. 1:25-cv-00448-JRR, ECF No. 13-1 ¶ 9.)  Nevertheless, in their oppositions to the Petition, Respondents apply provisions of the MUAA

to support their arguments that the dispute resolution process contemplated by the APA in §
2.06(b)(vii) and (viii) does not constitute "arbitration" or is subject to vacatur.  (ECF No. 121
at pp. 18–27; ECF No. 192-1 at pp. 5–20.)[18]  The parties' do not directly address whether the
FAA is applicable here.[19]

As set forth above, under § 2 of the FAA:

> A written provision in . . . a contract evidencing a transaction
> involving commerce to settle by arbitration a controversy
> thereafter arising out of such contract or transaction . . . shall be
> valid, irrevocable, and enforceable, save upon grounds as exist
> at law or in equity for the revocation of any contract or as
> otherwise provided in chapter 4.

9 U.S.C. § 2.  "The FAA 'supplies not simply a procedural framework applicable in federal
courts; it also calls for the application, in state as well as federal courts, of federal substantive
law regarding arbitration.'"  *Dewan v. Walia*, 544 F. App'x 240, 244 (4th Cir. 2013).  As
previously held by this court, "[b]ecause 'Congress did not plainly intend arbitration to mean
different things in different states,' it is appropriate to apply federal law—rather than state
law—when evaluating whether the FAA is applicable[.]"  *Liberty Mut. Grp., Inc. v. Wright*, No.
CIV.A. DKC 12-0282, 2012 WL 718857, at *5 (D. Md. Mar. 5, 2012) (internal citation
omitted).

"The FAA creates a separate federal cause of action for enforcement of agreements
within its scope, even if the underlying dispute depends entirely on state law."  *Whiteside v.
Teltech Corp.*, 940 F.2d 99, 101 (4th Cir. 1991)  "[A] contract's general choice-of-law provision
does not displace federal arbitration law if the contract involves interstate commerce."  *Rota-*

---

[18] In its opposition, HDL notes that in the introduction, the Petition seeks confirmation of the Vallit report pursuant
to provisions of the MUAA "and/or 9 U.S.C. § 9" of the FAA.  (*See* Case No. 1:25-cv-00448-JRR, ECF No. 1 at
p. 1.)  HDL also asserts "the Petition did not set forth facts establishing the applicability of the FAA," which it
claims, "does not preempt the MUAA in this case."  (ECF No. 192-1 at p. 4 n.3.)

[19] The court notes that in Ms. Denison's reply to Messrs. Horsey' opposition, she acknowledges that "[b]oth
Maryland State Court decisions and federal decisions are relevant in discussing the scope of arbitral review, as
the MUAA is the 'state analogue' to the [FAA] and, as such, jurisprudence interpreting each is consistent."  (ECF
No. 122 at p. 15 n.9.)

*McLarty v. Santander Consumer USA, Inc.*, 700 F.3d 690, 697 n.7 (4th Cir. 2012). "[T]he term 'evidencing a transaction' [in § 2 of the FAA] requires only that the transaction in fact involved interstate commerce, not that the parties contemplated it as such as the time of the agreement." *Id.* at p. 697 (citing *Allied–Bruce Terminix Cos. v. Dobson,* 513 U.S. 265, 281 (1995)). The Fourth Circuit has held that reliance upon funds or financing from a foreign state "in a transaction is sufficient to implicate the FAA." *Id.; see* 9 U.S.C. § 1 (defining "commerce" as "commerce among the several States or with foreign nations"). The Supreme Court has "interpreted the term 'involving commerce' in the FAA as the functional equivalent of the [] term 'affecting commerce'—words of art that ordinarily signal the broadest permissible exercise of Congress' Commerce Clause power." *Citizens Bank v. Alafabco, Inc.,* 539 U.S. 52, 56 (2003) (citing *Allied–Bruce Terminix Cos.,* 513 U.S. at 273–74).

Here, the court is satisfied that the APA evidences a transaction involving "commerce among the several states," as the contract is among, *inter alia*, Ms. Denison, a Florida obligee, and Messrs. Horsey, Delaware guarantors. (Case No. 1:25-cv-00448-JRR, ECF No. 1 ¶¶ 1, 3–4); *see Michelin Tire Corp. v. Todd*, 568 F. Supp. 622, 624 (D. Md. 1983) (finding that a contract between a Maryland guarantor and a New York obligee involved "commerce among the several states" because "if performed, it would involve the payment of money from Maryland to New York."); *Allen v. Chevron U.S.A. Inc.,* No. 5:22-CV-18, 2023 WL 2603941, at *8 (N.D.W. Va. Mar. 22, 2023) (finding transaction between residents of different states implicates interstate commerce under the FAA). Moreover, the parties could have, but did not, provide in the APA that Maryland arbitration law would apply instead of federal arbitration law. *See Porter Hayden Co. v. Century Indem. Co.,* 136 F.3d 380, 383 (4th Cir. 1998*)* (finding that an agreement's choice of law provision that did not specify whether state or federal arbitrability law applied could reasonably be read "merely as specifying that Maryland substantive law be applied to resolve disputes arising out of the contractual relationship" and "absent a clearer

expression of the parties' intent to invoke state arbitration law," the court presumed the parties intended the FAA to govern construction of the agreement's arbitration clause).  Because the APA does not contain a choice of law provision which specifies which law applies to the dispute resolution process set forth therein, federal law applies.

Accordingly, the court finds that the FAA and federal arbitration law applies to this dispute, and the MUAA is not implicated.

### 2. *Whether the Parties Engaged in Arbitration*

Having concluded that the FAA applies, the court looks to federal law to determine whether the parties engaged in arbitration when they submitted their dispute to Vallit, the independent accounting firm.

As previously explained by this court:

> Because "Congress did not plainly intend arbitration to mean different things in different states," *Salt Lake Tribune Publ'g Co.,* 390 F.3d at 689, it is appropriate to apply federal law— rather than state law—when evaluating whether the FAA is applicable to the [] provision here.
>
> In determining whether [a] provision constitutes an enforceable arbitration clause under the FAA, thereby triggering the FAA, "[i]t is . . . irrelevant that the contract language in question does not employ the word 'arbitration' as such.  Rather, what is important is [whether] the parties clearly intended to submit some disputes" to binding review by a third party. *McDonnell Douglas Fin. Corp. v. Pa. Power & Light Co.,* 858 F.2d 825, 830–31 (2nd Cir. 1988) . . . .
>
> Federal courts have used "differing verbal formulations" to determine whether a particular dispute resolution procedure constitutes "arbitration" under the FAA.  *See Advanced Bodycare Solutions, LLC v. Thione Int'l, Inc.,* 524 F.3d 1235, 1239 (11th Cir. 2008).
>
>> One widely-followed opinion asks whether the parties have agreed to submit a dispute to a third party for a decision. *AMF Inc. v. Brunswick Corp.,* 621 F. Supp. 456, 460 (E.D. N.Y. 1985) (Weinstein, J.).  Other authority considers how closely the procedure chosen resembles "classic arbitration" and whether enforcing it serves the

17

> intuited purposes of Congress. *Fit Tech, Inc.*[, 374 F.3d at 6–7]; *Salt Lake Tribune Publg Co.*[,390 F.3d at 689–90].
>
> *Id.* Although different in formulation, these definitions "do not constitute a real disagreement, because submitting a dispute to a third party for a binding decision is quintessential 'classic arbitration.'" *Id.* (citing *Salt Lake Tribune Publ'g Co.,* 390 F.3d at 689).

*Wright*, 2012 WL 718857, at *5 (finding FAA applicable to parties' dispute as to whether an appraisal provision constituted an arbitration clause when the parties pointed principally to state law cases in support of their respective arguments). Additional general guidance is found in Black's Law Dictionary, which defines "arbitration" as a "dispute-resolution process in which the disputing parties choose one or more neutral third parties to make a final and binding decision resolving the dispute." *Arbitration*, Black's Law Dictionary (12th ed. 2024).

As noted by Ms. Denison, numerous courts have held that substantially similar provisions requiring unresolved disputes to be submitted to an independent accounting firm for final, binding, and conclusive resolution is properly characterized as a narrow arbitration clause under the FAA. *McLaughlin v. Day & Zimmerman Int'l, Inc.,* No. 2:08CV391, 2009 WL 10689227, at *5 (E.D. Va. Apr. 24, 2009) (collecting cases); *see Wilbert, Inc. v. Homan*, No. 3:13-CV-30-RJC-DSC, 2013 WL 6238286, at *3 (W.D.N.C. Dec. 3, 2013) (holding parties' stock purchase agreement, including a provision to employ an independent accountant to resolve disputes relating to post-closing adjustments, constituted arbitration and fell within the purview of the FAA); *Seed Holdings, Inc. v. Jiffy Int'l AS*, 5 F. Supp. 3d 565 (S.D.N.Y. 2014) (same analysis); *E.S. Originals Inc. v. Totes Isotoner Corp.*, 734 F. Supp. 2d 523, 529–30 (S.D.N.Y. 2010) (same analysis); *Butler Prods. Co. v. Unistrut Corp.,* 367 F.2d 733, 734–36 (7th Cir. 1966) (same analysis).

HDL cites authority for the proposition that the dispute resolution process contemplated by § 2.06 of the APA is more appropriately referred to as an "expert determination" or

"accountant true-up" than an arbitration.  (ECF No. 192-1 at pp. 10–11.)  In one case cited by HDL, *Archkey Intermediate Holdings Inc. v. Mona*, the Delaware Chancery Court analyzed the parties' stock purchase agreement, which provided that disputes regarding an adjusted closing balance sheet would be submitted to an independent accountant if the parties could not resolve their disputes, similar to the provision at issue here.  302 A.3d 975, 985 (Del. Ch. 2023).  There, the parties' agreement expressly stated that the independent accountant would act as an arbitrator.  *Id.*  Nonetheless, the court found that the relevant provision in the agreement was an "Accountant True-Up Mechanism," which, it held, "does not involve arbitration under the FAA; it calls for an expert determination."  *Id.* at 989.  The court explained the distinction as follows:

> Although experts are often loosely described as being some kind of arbitrator, the fact is that they are not. Experts are a distinct species of dispute resolver. The expert can be a firm, not an individual. The expert does not operate under a set of established procedural rules and generally has broad investigatory powers. Although the parties may engage with the expert through counsel, lawyers are not the principal players, and the expert can take an inquisitorial, investigative approach. Experts are not immune from suit and can be held liable. Unless the contract specifies, an expert determination is not reviewable by a court. Expert determinations generally operate like factual determinations and are unenforceable in their own right. Most importantly, expert determinations are governed by state contract law, and not by the FAA or a state-level equivalent.

*Id.* at 990.

Accordingly, Delaware courts and other leading commercial jurisdictions use the "authority test," which "turns primarily on the degree of authority delegated to the decision-maker[]" to determine whether parties have opted for arbitration as opposed to an expert determination.  *ArchKey*, 302 A.3d at 993.  Importantly, the *ArchKey* court noted that Delaware courts had not always applied the authority test or treated an Accountant True-Up Mechanism as a distinct form of alternative dispute resolution until the Delaware Supreme Court issued an opinion in which it found that an independent accountant acted as an expert and not an

arbitrator, emphasizing the narrow scope of an Accountant True-Up Mechanism. *Id.* at 994 (citing *Chi. Bridge & Iron Co. N.V. v. Westinghouse Elec. Co. LLC*, 166 A.3d 912, 931 (Del. 2017)). Consistent with its binding precedent, the court held that an Accountant True-Up Mechanism "is not legal arbitration [or classic arbitration], no matter what label the parties use for the independent accountant." *Id.*

Notably, the Fourth Circuit has twice affirmed that a similar provision to the one here— within an asset purchase agreement submitting certain disputes to an independent accountant for final and binding resolution—constitutes an arbitration clause. *New River Mgmt. Co. v. Henry Schein Inc.*, 9 F. App'x 232, 234–35 (4th Cir. 2001) (finding parties' agreement calling for an independent accountant to resolve disputes related to the computation of contingent consideration in accordance with a discrete provision within the agreement constituted a narrow arbitration clause); *Elox Corp. v. Colt Indus., Inc.*, 952 F.2d 395 (4th Cir. 1991) (affirming the district court's holding that parties had entered into an agreement to arbitrate when the parties' dispute related to the scope and amount of closing adjustments and the relevant provision of the parties' agreement provided that such dispute was to be submitted to an accounting firm for binding resolution).[20]

Applying the above to the provision at issue here, the court finds that the dispute resolution process outlined in § 2.06(b)(vii) and (viii) of the APA is a narrow agreement to arbitrate. The provision clearly manifests the parties' intent to resolve certain disputes—

---

[20] While the court observes that the above-referenced Delaware state cases were decided after the unpublished opinions in *New River Mgmt. Co.* and *Elox Corp.*, as a trial court sitting in the Fourth Circuit, the court finds *New River Mgmt. Co.* and *Elox Corp.* persuasive; they directly address the material issue in contest on the Petition and no on-point, published Fourth Circuit opinion has been cited by the parties or is otherwise known to the court. *See* Local Rule 32.1 (4th Cir. 2026) (regarding party citation to unpublished opinions, and noting: "Citation of this Court's unpublished dispositions issued prior to January 1, 2007, in briefs and oral arguments in this Court and in the district courts within this Circuit is disfavored, except for the purpose of establishing res judicata, estoppel, or the law of the case. If a party believes, nevertheless, that an unpublished disposition of this Court issued prior to January 1, 2007, has precedential value in relation to a material issue in a case and that there is no published opinion that would serve as well, such disposition may be cited if the requirements of FRAP 32.1(b) [regarding provision of copies] are met.") Therefore, the court declines to follow Delaware state law where pre-2007 unpublished Fourth Circuit authority exists that is squarely on point regarding the material issue before the court.

namely, those concerning purchase price adjustments under § 2.06—by submitting them to a neutral Accounting Firm (here, Vallit).  As set forth above, the dispute resolution process in the APA provides: "Absent fraud, willful misconduct or manifest error, such determination will be final, binding and conclusive on the Parties."  APA § 2.06(b)(viii).  This language is materially similar, if not identical, to language contained in similar agreements numerous other courts, including courts within this circuit, have reviewed and held to constitute narrow arbitration provisions.

The fact that § 2.06 provides that the "Accounting Firm shall act as an expert" does not change the court's conclusion.  "[P]ublic accounting firm[s] with expertise in business valuation and complex accounting matters [are] frequently called upon by contracted parties to arbitrate financial disputes even when such arbitrator is contractually bound to give great deference to, or is even constrained by the parties' submitted calculations."  *McLaughlin*, 2009 WL 10689227, at *8.  While the court appreciates the nuanced distinction between classic arbitration and expert determinations described by the Delaware court, at bottom, this is quintessential "classic arbitration" because the parties here agreed to submit their disputes to a third party for binding resolution.  *Liberty Mut. Grp., Inc. v. Wright*, No. CIV.A. DKC 12-0282, 2012 WL 718857, at *5 (D. Md. Mar. 5, 2012); *see also New River Mgmt. Co. v. Henry Schein Inc.*, 9 F. App'x 232 (4th Cir. 2001), and *Elox Corp. v. Colt Indus., Inc.*, 952 F.2d 395 (4th Cir. 1991), *supra*.

Further supporting the conclusion that the parties engaged in arbitration, in their initial Answer to the Petition, Respondents admit the parties "were unable to resolve all of their disputes and that the parties formally requested and received a partial stay of this action with respect to the subject Working Capital Adjustment disputes, so that the parties could proceed to present those disputes to" Vallit, the accounting firm.  (ECF No. 13-1 ¶ 23.)  Indeed, as explained previously, the Joint Motion to Stay submitted by Ms. Denison and HDL provided:

"The parties have since agreed to submit all disputes concerning the Working Capital Adjustments to Vallit [] for binding resolution of the same, in accordance with the terms of the [APA]." (ECF No. 12 ¶ 6.)  Further, the parties jointly explained, "[t]he requested stay is in the interest of judicial economy in that it will allow the parties to possibly resolve a portion of the parties' respective claims in this matter without judicial intervention, thereby reducing the scope of this litigation."  *Id.* ¶ 8.[21]  Having previously asserted that all disputes concerning Working Capital Adjustments should be resolved through a binding process without judicial intervention in the interest of judicial economy, Respondents may not escape that resolution by claiming judicial intervention is now essential because their chosen expert resolved the dispute contrary to their interests.

Accordingly, and mindful of the federal policy favoring arbitration, the court concludes that the parties formed an agreement to arbitrate and subsequently engaged in arbitration when they submitted their disputes concerning the Working Capital Adjustments for binding resolution to Vallit in accordance with §§ 2.06(b)(vii)-(ix) of the APA.  Thus, the award issued by Vallit is properly classified as an arbitration award.[22]

**B. Timeliness**

Next, Respondents argue that "[t]o the extent the Court concludes the report is an [arbitration] award . . . , it should not be confirmed, but, instead, must be set aside because the

---

[21] As Ms. Denison notes, previous counsel for Respondents, during the course of proceedings before Vallit, stated, "I would like to once again remind Mr. Fenn that this is not a litigation proceeding, but is an arbitration process in which we have chosen an expert." (ECF No. 122-1 at p. 46.)  Evidently, the parties had no question they were engaged in arbitration.

[22] HDL argues the parties' Engagement Letter with Vallit is the relevant agreement which this court should assess with respect to the instant dispute because the Engagement Letter incorporates the terms of § 2.06 of the APA and adds terms of the firm's engagement.  This is unpersuasive.  The Engagement Letter is simply that—the engagement agreement setting forth the Vallit firm's terms of engagement and the like.  Moreover, § 2.06 of the APA expressly states that in connection with the submission of a dispute to the Accounting Firm, "and in connection with such engagement, Buyer and Seller shall execute any engagement, indemnity and other agreements that the Accounting Firm reasonably may require as a condition to such engagement."  APA § 2.06(b)(vii).  The court agrees with Ms. Denison that the Engagement Letter "is merely the contract that governs the parties' engagement of Vallit to carry out the dispute-resolution framework" and it "has zero relevance to construing the meaning of § 2.06 of the" APA.  (ECF No. 196 at p. 10.)

22

Accounting Firm grossly exceeded their powers and/or was evidently []partial[23] and engaged in misconduct prejudicing HDL and, by extension, the Horseys." (ECF No. 121 at p. 19.)  Ms. Denison contends that the court must confirm the arbitration award because Respondents failed to move to vacate the award within the statutorily mandated time.  (ECF No. 122 at p. 14.)

Section 9 of the FAA provides that where the parties' agreement does not specify a court in which the prevailing party should petition for judgment on (confirmation of) the award, the prevailing party "may" file such a petition in "the United States court in and for the district within which such award was made."[24]  9 U.S.C. § 9.[25]  As acknowledged by the Supreme Court: "On application for an order confirming the arbitration award, the court 'must grant' the order 'unless the award is vacated, modified, or corrected as prescribed in sections 10 and 11 of this title.'  There is nothing malleable about 'must grant,' which unequivocally tells courts to grant confirmation in all cases, except when one of the 'prescribed' exceptions applies. This does not sound remotely like a provision meant to tell a court what to do just in case the parties say nothing else." *Hall St. Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 587 (2008) (quoting 9 U.S.C. § 9).

Section 12 of the FAA provides: "[n]otice of a motion to vacate, modify, or correct an award must be served upon the adverse party or his attorney within three months after the award is filed or delivered."  9 U.S.C. § 12.  "A confirmation proceeding under 9 U.S.C. § 9 is intended to be summary: confirmation can only be denied if an award has been corrected, vacated, or modified in accordance with the Federal Arbitration Act." *Taylor v. Nelson*, 788 F.2d 220, 225 (4th Cir. 1986).  "[W]hen a party moves to confirm an arbitration award and the opposing party asserts in its opposition that the award should be vacated, '[a] separate motion . . . to vacate the arbitrators' award is not necessary.  Such relief may properly be requested in

---

[23] The Opposition at ECF No. 121 says "impartial."  The court reads this as a clerical error.
[24] The court also notes the parties' Maryland forum selection clause at § 8.10 of the APA.
[25] Section 9 also addresses the procedure to follow where the parties' agreement specifies that the judgment shall be entered on the award and designates the particular court for same.

the papers submitted in opposition to a motion to confirm an arbitrators' award.'" *Slavin v. Imperial Parking (U.S.), LLC*, No. CV PWG-16-2511, 2017 WL 2629044, at *8 (D. Md. June 19, 2017) (citing *Catz Am. Co. v. Pearl Grange Fruit Exch., Inc.*, 292 F. Supp. 549, 551 (S.D.N.Y. 1968)).

If a party seeks to have an arbitration award vacated by way of an opposition to a petition to conform or enforce an award, the request must be made within the three-month period set forth in § 12. *Id.* (collecting cases); *see Ad Hoc Rsch. Assocs., LLC v. Gertis*, No. CV 24-3069-BAH, 2025 WL 101155, at *5 (D. Md. Jan. 14, 2025), *aff'd*, No. 25-1074, 2025 WL 1111481 (4th Cir. Apr. 15, 2025) (explaining that the court was "constrained by the inflexibility of the FAA to confirm the [arbitration] award" because the respondent had not sought to vacate, modify, or correct the award within three months).  Importantly, "[t]he Fourth Circuit has strongly intimated—but has stopped short of explicitly holding—that there are no equitable exceptions to the three-month limitations period set forth in the Federal Arbitration Act." *Parsons, Brinckerhoff, Quade & Douglas, Inc. v. Palmetto Bridge Constructors,* 647 F. Supp. 2d 587, 594 (D. Md. 2009); *see also Taylor,* 788 F.2d at 225 ("The existence of any such exceptions to § 12 is questionable, for they are not implicit in the language of the statute, and cannot be described as common-law exceptions because there is no common-law analogue to enforcement of an arbitration award.").[26]

Because the court finds § 2.06 of the APA is an agreement to arbitrate under the FAA, the three-month limitations period applies here.[27]  Here, the arbitration award was issued by

---

[26] Regardless, Respondents offer no equity-based argument or explanation for their failure to move to vacate, modify or correct the Vallit report within the statutory timeframe.

[27] Relying on the statutory time limit set forth in the MUAA, Ms. Denison asserts that the court must confirm the arbitration award because Respondents were required to file a petition or a motion to vacate the award on or before March 3, 2025, 30 days after the arbitration award was issued.  (ECF No. 122 at p. 14.)  *See* MD. CODE, CTS. & JUD. PROC. § 3-224(a)(1) ("[A] petition to vacate the [arbitration] award shall be filed within 30 days after delivery of a copy of the award to the petitioner.").  As explained above, however, the FAA applies, so Respondents could seek vacatur within three months following issuance of the award.  Notwithstanding the triple-wide berth of the FAA, Respondents did not seek vacatur on a timely basis.

Vallit on January 30, 2025, and the Petition followed on February 11, 2025. (Case No. 25-cv-448, ECF No. 1-2 at p. 2.)  Accordingly, pursuant to § 12 of the FAA, Respondents had until April 30, 2025, to contest the award—*i.e.,* to request vacatur, modification or correction. Respondents filed a joint Answer to the Petition on April 8, 2025, within the three-month period; however, the Answer does not seek to vacate, modify, or correct the arbitration award. (Case No. 25-cv-448, ECF No. 13-1.)  Rather, the Answer asserts affirmative defenses and seeks dismissal of the Petition for, *inter alia*, failure to state a claim, waiver, and failure to satisfy conditions precedent to filing suit.  *Id*. at pp. 4–5.  Respondents' vacatur arguments were asserted for the first time in their separate responses in opposition to the Petition.  (ECF Nos. 121 (filed December 8, 2025), 192 (filed May 5, 2026.))[28]

As correctly noted by Ms. Denison, Respondents cannot claim "that they were unaware of any need to file a petition or motion to vacate in light of their [expressed] belief that the [a]ward was not an arbitration award."  (ECF No. 122 at pp. 14–15 n.8.); *see Choice Hotels Int'l, Inc. v. Shiv Hosp., L.L.C.,* 491 F.3d 171, 178 (4th Cir. 2007) (finding respondent who chose not to file a motion to vacate an award within the statutory period because the award was "contrary to Fourth Circuit law" made no sense because "if the award was without-a-doubt *ultra vires*, [respondent] should have been jumping at the chance to return to federal court and have the award vacated.").

Accordingly, Respondents failed to meet their burden to clearly establish one of the grounds for vacating the Vallit award within the statutory time period.  *See Jih,* 800 F. Supp. at 317, *supra*.  Thus, the court is bound to confirm the arbitration award pursuant to the FAA.  *See Taylor,* 788 F.2d at 225, *supra*; 9 U.S.C. § 9.  As aptly explained by the Eleventh Circuit:

> The laudatory goals of the FAA will be achieved only to the
> extent that courts ensure arbitration is an alternative to litigation,

---

[28] Even if the court allows that Vallit's confirmatory email of February 6, 2025, is the date of issuance of the award, Respondents' requests for vacatur are untimely.  *See* footnote 9, *supra*.  Further, the timing of the court's grant of HDL's above-mentioned Motion for Reconsideration does not change the outcome, as HDL failed to move to vacate the Vallit report when it could have following initiation of the action with the Petition.

> not an additional layer in a protracted contest.  If we permit parties who lose in arbitration to freely relitigate their cases in court, arbitration will do nothing to reduce congestion in the judicial system; dispute resolution will be slower instead of faster; and reaching a final decision will cost more instead of less.

*B.L. Harbert Int'l, LLC v. Hercules Steel Co.*, 441 F.3d 905, 907 (11th Cir. 2006), *abrogated on other grounds by Frazier v. CitiFinancial Corp.,* 604 F.3d 1313 (11th Cir. 2010).  The three-month "limitations period serves [t]he role of arbitration as a mechanism for speedy dispute resolution, as well as the national policy favoring arbitration that [t]he FAA embodies." *Slavin*, 2017 WL 2629044, at *7 (citing *Popular Sec., Inc. v. Colón*, 59 F. Supp. 3d 316, 318–19 (D.P.R. 2014) (internal quotations omitted).  Accordingly, the court finds that confirmation of the arbitration award in this case would advance the policy objectives of the FAA.

### C.  Grounds for Vacatur[29]

Even setting aside Respondents' failure to file a timely request to vacate the arbitration award, the court does not find the award is subject to vacatur on any ground under the FAA. "If there is a valid contract between the parties providing for arbitration, and if the dispute resolved in the arbitration was within the scope of the arbitration clause, then substantive review is limited to those grounds set out in [9 U.S.C. § 10]." *State Auto. Mut. Ins. Co. v. Rod & Reel, Inc.*, No. CV PWG-18-340, 2018 WL 5830734, at *5 (D. Md. Nov. 7, 2018), *aff'd,* 774 F. App'x 168 (4th Cir. 2019) (quoting *Choice Hotels Int'l, Inc. v. Shriji 2000*, No. DKC-15-1577, 2015 WL 5010130, at *1 (D. Md. Aug. 21, 2015)).

Section 10 of the FAA allows for vacatur of an award in the following circumstances:

---

[29] Respondents' initial Answer to the Petition did not clearly establish any ground for vacatur within the statutory period.  The court notes, however, that the last affirmative defense provided in the Answer was an incomplete sentence: "The Petition should be dismissed in whole or in part due to the manifest . . . ." (Case No. 1:25-cv-00448-JRR, ECF No. 13-1 at p. 5 ¶ 9.)  It is unclear whether Respondents intended to assert "manifest error" per § 2.06(b)(viii) of the APA, or "manifest disregard of the law," a ground for vacatur of an arbitration award recognized under the MUAA and FAA.  Respondents raise no argument on this; it is not incumbent upon the court to address arguments not advanced by the parties.  Nevertheless, for the sake of completeness, the court addresses the separate grounds for vacatur asserted by Respondents in their subsequent oppositions.

26

     (1) where the award was procured by corruption, fraud, or undue means;

     (2) where there was evident partiality or corruption in the arbitrators, or either of them;

     (3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or

     (4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a).

A court may also vacate an award on certain limited common law grounds, namely, "when the award fails to draw its essence from the contract or the award evidences a manifest disregard of the law." *Meekins v. Lakeview Loan Servicing, LLC*, No. 3:19CV501 (DJN), 2019 WL 7340300, at *4 (E.D. Va. Dec. 30, 2019) (citing *Patten v. Signator Ins. Agency, Inc.*, 441 F.3d 230, 234 (4th Cir. 2006)). An arbitration award "fails to draw its essence from the agreement only when the result is not 'rationally inferable from the contract.'" *Patten*, 441 F.3d at 235 (quoting *Apex Plumbing Supply, Inc. v. U.S. Supply Co,* 142 F.3d 188, 193 n.5 (4th Cir. 1998)). Similarly, 'a manifest disregard of the law is established where the arbitrator understands and correctly states the law, but proceeds to disregard the same.'" *Id.* (quoting *Upshur Coals Corp. v. United Mine Workers, Dist. 31,* 933 F.2d 225, 229 (4th Cir. 1991) (internal quotations omitted). Importantly, however, "[m]ere misinterpretation of a contract or an error of law does not suffice to overturn an award." *Choice Hotels Int'l, Inc. v. Patel*, No. CV DKC 16-0659, 2016 WL 9404898, at *1 (D. Md. May 4, 2016) (citing *Upshur Coals Corp.*, 933 F.2d at 229). "The burden is on the party challenging an award to prove the existence of one of the grounds for vacating the award." *Id.*

As previously explained, "[a] court must determine only whether the arbitrator did his job-not whether he did it well, correctly, or reasonably, but simply whether he did it." *PPG Indus. Inc.*, 587 F.3d at 652. This is "because parties who agree to arbitrate 'assume the risk that the arbitrator may interpret the law in a way with which they disagree.'" *Friedler v. Stifel, Nicolaus, & Co., Inc.*, 108 F.4th 241, 246 (4th Cir. 2024) (quoting *Wachovia Sec., LLC v. Brand*, 671 F.3d 472, 478 n.5 (4th Cir. 2012)). Moreover, "authority interpreting the FAA has held that [even where] an arbitrator's decision is not based on an agreement's express terms does not mean that it is not properly derived from the agreement; neither misapplication of principles of contractual interpretation nor erroneous interpretation of the agreement in question constitutes grounds for vacating an award." *Apex Plumbing Supply, Inc.,* 142 F.3d at 194 (finding that "even if the claimed miscalculation of [figures] constituted a 'material mistake,' the miscalculation was not 'evident' because it did not appear on the face of the arbitration award" and the miscalculation was insufficient grounds for modification of the award).

Messrs. Horsey argue that even if the court were to conclude the Vallit report is an arbitration award (as it does here), the award is subject to vacatur because Vallit "grossly exceeded its authority"; "manifestly disregarded the law"; and is "guilty of partiality or misconduct[] prejudicing HDL and the Horseys' rights." (ECF No. 121 at pp. 19–27.)[30] For its part, HDL does not independently address grounds to vacate pursuant to the MUAA or FAA in the event the court were to find the Vallit report is a confirmation award. Rather, HDL states

---

[30] Respondents rely on the grounds for vacatur pursuant to the MUAA. Regardless, the MUAA and the FAA provide substantially similar grounds for vacating an arbitration award. Pursuant to the MUAA, a court shall vacate an award under five grounds:

1. An award was procured by corruption, fraud, or other undue means;
2. There was evident partiality by an arbitrator appointed as a neutral, corruption in any arbitrator, or misconduct prejudicing the rights of any party;
3. The arbitrators exceeded their powers;
4. The arbitrators ... refused to hear evidence material to the controversy, or otherwise so conducted the hearing ... as to prejudice substantially the rights of a party; or
5. There was no arbitration agreement as described in § 3-206 of this subtitle, the issue was not adversely determined in proceedings under § 3-208 of this subtitle, and the party did not participate in the arbitration hearing without raising the objection.

MD. CODE ANN., CTS. & JUD. PROC. § 3-224(b).

28

that it "agrees with the Horseys' assessment of Vallit's gross errors, as discussed in the Horsey

[b]rief" and "those errors are significant and require proper remediation and consideration."

(ECF No. 192-1 at p. 19.)

The Horseys' opposition cites no legal authority in support of their vacatur arguments.

(ECF No. 121 at pp. 20–27.)  Nevertheless, whether under the MUAA or the FAA, as stated

above, the court does not find that the arbitration award issued by Vallit is subject to vacatur

on any ground Respondents raise.

First, as for when arbitrators exceed their powers pursuant to § 10(a)(4), the Supreme

Court has explained:

> Oxford invokes § 10(a)(4) of the Act, which authorizes a federal
> court to set aside an arbitral award where the arbitrator exceeded
> his powers. A party seeking relief under that provision bears a
> heavy burden. It is not enough . . . to show that the arbitrator
> committed an error—or even a serious error.  . . . Because the
> parties bargained for the arbitrator's construction of their
> agreement, an arbitral decision even arguably construing or
> applying the contract must stand, regardless of a court's view of
> its (de)merits. . . . Only if the arbitrator acts outside the scope of
> [his] contractually delegated authority—issuing an award that
> simply reflects [his] own notions of economic justice rather than
> drawing its essence from the contract—may a court overturn his
> determination. So the sole question for us is whether the
> arbitrator (even arguably) interpreted the parties' contract, not
> whether he got its meaning right or wrong.

*Oxford Health Plans LLC v. Sutter*, 569 U.S. 564, 569 (2013) (internal citations and quotations

omitted) (cleaned up).  Here, both the Vallit Engagement Letter and the Vallit award expressly

state that Vallit's work was "governed by the terms outlined in Section 2.06 of the" APA and

that it "was limited to any unresolved items in the Post-Closing Statement Dispute Notice."

(Case No. 1:25-cv-00448-JRR, Ex. 1, ECF No. 1-2 at p. 2 and Ex. 5, ECF No. 1-6 at p. 2.)

Accordingly, Vallit issued an award that drew its essence from the parties' agreement (the APA)

and it does not "simply reflect[] [its] own notions of economic justice" as would permit this

court to overturn its final determination.  *Oxford*, 569 U.S. at 569.  Thus, the court does not

29

find that Vallit "exceeded its powers" or "so imperfectly executed them" to warrant vacatur pursuant to § 10(a)(4).

Next, Messrs. Horsey argue that because Vallit is an accounting firm, "its [failure] to accurately report" certain mathematical errors or to accurately account for various "figures in its report constitutes a clear manifest disregard of the law." (ECF No. 121 at p. 25.) As previously explained by this court:

> To vacate an arbitration award on the grounds of "manifest disregard of the law," the petitioner must show "(1) the disputed legal principle is clearly defined and is not subject to reasonable debate; and (2) the arbitrator refused to apply that legal principle." *Jones*, 792 F.3d at 402. Challenging an award on this ground "is not an invitation to review the merits of the underlying arbitration or to establish that the arbitrator misconstrued or misinterpreted the applicable law." *Id.* (citations and internal quotation marks omitted). An award can be vacated under this standard where the award "fails to draw its essence from the contract," such as where "an arbitrator has disregarded or modified unambiguous contract provisions or based an award upon his own personal notions of right and wrong." *Choice Hotels Int'l, Inc. v. SM Prop. Mgmt., LLC*, 519 F.3d 200, 207 (4th Cir. 2008) (citations and internal quotation marks omitted).

*Star Dev. Grp., LLC v. Constructure Mgmt., Inc.*, No. CV RDB-16-1246, 2018 WL 1525703, at *6 (D. Md. Mar. 28, 2018), *aff'd sub nom. Star Dev. Grp., LLC v. Darwin Nat'l Assurance Co.*, 813 F. App'x 76 (4th Cir. 2020). Here, again, the court does not find that the Vallit award reflects that Vallit disregarded or modified any unambiguous provision in § 2.06 of the APA. The award outlines at length its conformity and constraint with this provision of the APA. Moreover, even in its clarification email to the parties after issuance of the award, Vallit acknowledged that "the cash on hand [was] a separate issue and not included in [their] working capital adjustment"—and this was based on additional review of the relevant provision of the APA. (Case No. 1:25-cv-00448-JRR, Ex. 7, ECF No. 1-8 at p. 2).

Finally, Respondents argue that Vallit was guilty of partiality or misconduct prejudicing Respondents rights because it failed to "hold a hearing," "accepted as true all of the data

30

contained in records put before it," and failed to consider whether "certain invoices payable and invoices receivable[] [were] factually accurate." (ECF No. 121 at p. 26.) As set forth previously, the arbitration provision at § 2.06 did not require a hearing. Regardless, as explained, "neither misapplication of principles of contractual interpretation nor erroneous interpretation of the agreement in question constitutes grounds for vacating an award[,]" even if there is a claimed miscalculation and even if it were a material mistake. *Apex Plumbing Supply, Inc.,* 142 F.3d at 194, *supra.*

Insofar as Respondents' argument relates to the scope of the agreement, the Fourth Circuit has held, "[t]he dispute over whether the amounts at issue are properly considered closing adjustments is properly classified as an issue relating to the determination of closing adjustments. Disagreements related to the scope of arbitration are resolved in favor of arbitration." *Elox Corp.*, 952 F.2d at *3 (citations omitted) (finding that the provision at issue specified that all issues related to the determination of the closing adjustments were to be decided by an accounting firm). Here, Respondents argue that Vallit was "guilty" of partiality or misconduct when it accepted as true all of the records before it. As to Vallit's duties, the APA explains that "Seller and Buyer shall instruct the Accounting Firm to resolve the disputed items in accordance with this Agreement, including this Section 2.06, and to deliver to Seller and Buyer a written determination (such determination to include a worksheet setting forth all material calculations used in arriving at such determination and to be based solely on information provided to the Accounting Firm by Seller and Buyer, or their respective designees) of the disputed items[.]" (APA § 2.06(b)(viii), Case No. 1:25-cv-00448-JRR, Ex. 2, ECF No. 1-3.) Nothing in the record before the court suggests or supports the conclusion that Vallit engaged in misconduct or that the process was tainted by partiality that prejudiced any parties' rights.

Accordingly, even had they mounted their disputes in a timely basis, Respondents fail to meet their "heavy burden" to demonstrate any ground for vacatur is present here.[31]

### D. Interest, Attorneys' Fees, and Other Expenses

Ms. Denison also seeks "plus pre-judgment and post-judgment interest, plus all attorneys' fees and costs, and plus all of Vallit's expenses paid by Ms. Denison." (Case No. 1:25-cv-00448-JRR, ECF No. 1 at pp. 10–11.)  The Petition further provides that, should the court grant the Petition, Ms. Denison "will submit a statement in support of and calculating the pre-judgment interest, attorneys' fees and costs, and other expenses owed in conformity with the [a]ward within ten (10) calendar days of this [c]ourt's Order confirming the [a]ward." *Id.* at p. 11.

With regard to fees and expenses relating to the appointment of Vallit and work performed by Vallit pursuant to § 2.06 of the APA, the APA provides that such fees and expenses:

> shall be allocated to and borne by Buyer, on one hand, and Seller, on the other hand, based upon the percentage that the portion of the amount contested by and not awarded to a Party bears to total amount in dispute, as determined by the Accounting Firm. By way of illustration, if Buyer claims that there is a deficiency amount of $100,000, Seller claims that there is an excess amount of $25,000 and the Accounting Firm determines that there is a deficiency amount of $25,000, then the costs and expenses of the Accounting Firm will be allocated 40% to Seller ($50,000 / $125,000) and 60% to Buyer ($75,000 / $125,000).

(APA § 2.06(b)(viii), Case No. 1:25-cv-00448-JRR, Ex. 2, ECF No. 1-3.)

Regarding expenses generally, Article VIII of the APA provides:

> Except as otherwise expressly provided herein, all fees, costs and expenses, including, fees and disbursements of counsel, financial advisors and accountants incurred by the Companies or the Seller Parties in connection with this Agreement, the Ancillary Documents and the Contemplated Transactions shall be paid by the Party incurring such expenses.  Each Party will

---

[31] The court need not address Messrs. Horsey's argument that the court should defer adjudication of the Petition pending full adjudication of the related bankruptcy action, as the automatic stay imposed by the bankruptcy case has since been lifted.  (ECF No. 121 at pp. 27–28.)

> pay all of its expenses, including attorneys' and accountants' fees in connection with the negotiation of this Agreement, the Ancillary Documents and the Contemplated Transactions and the performance of its obligations hereunder or thereunder; provided that in any proceeding or other attempt to enforce, construe or to determine the validity of this Agreement or any Related Agreement, the non-prevailing Party will pay the reasonable expenses of the prevailing Party, including reasonable attorneys' fees and costs.

*Id.* § 8.01.

In light of the above, the court will order Petitioner to submit a petition for fees (and interest and expenses, as requested), setting forth relevant legal authority in support of such an award within 20 days of entry of the court's order accompanying this memorandum opinion. HDL and Messrs. Horsey shall be afforded an opportunity to respond (and Petitioner to reply) per the rules of court.[32]   Accordingly, although the court has concluded to confirm the Vallit arbitration award and enter judgment accordingly, the court will defer entering final judgment to allow for disposition of Petitioner's forthcoming fee petition.

## IV.   **<u>CONCLUSION</u>**

For the reasons set forth herein, by separate order, the Petition (Case No. 1:25-cv-00448-JRR, ECF No. 1) shall be granted as to confirmation of the Vallit award and final entry of judgment shall be stayed pending the court's disposition of the anticipated fee petition described above.

/S/

June 4, 2026

_____
Julie R. Rubin
United States District Judge

---

[32] In its opposition, HDL contends that, even if the court finds the Vallit report to be a confirmable arbitration award (as it does), the award is "by the terms of the Purchase Agreement, a narrow finding of fact, not an adjudication of ultimate legal liability."  (ECF No. 192-1 at p. 20.)  Accordingly, HDL asserts Ms. Denison "cannot obtain a monetary judgment until all legal issues concerning contractual liability are resolved and corresponding damages are awarded."  *Id.*  HDL cites no legal authority in support of this assertion.